Argued February 19, affirmed March 10, 1929.

IDA C. LYMAN, ADMINISTRATRIX, v. WALDEMAR T. JACOBSEN.

(275 Pac. 612.)

For appellant there was a brief over the names of *Mr. W. K. Royal* and *Messrs. Huntington, Wilson & Huntington* with oral arguments by *Mr. Royal* and *Mr. B. S. Huntington.*

For respondent there was a brief over the names of *Mr. C. A. Sheppard* and *Mr. John B. Cleland,* with an oral argument by *Mr. Sheppard.*

McBRIDE, J.—This is a suit in equity brought by Ida C. Lyman, as administratrix of the estate of DeWitt Henry Lyman, against the defendant Waldemar T. Jacobsen, to recover $13,755.05, received by the defendant from the Oregon Life Insurance Company

upon two policies of insurance issued by said insurance company upon the life of DeWitt Henry Lyman. It arises out of the following facts:

About March 1, 1922, the defendant and one Munro incorporated the Jacobsen-Munro Company and employed Lyman as general manager. Lyman had had 24 years of experience in the plumbing supply business in which the corporation engaged, and was exceptionally valuable to said company by reason of his great experience.

In November, 1923, the defendant Jacobsen, and Mr. Munro, one of the chief stockholders of the corporation, took out policies of insurance in the Oregon Life Insurance Company payable to the corporation, and Lyman, being then nearly fifty-three years old, at the request of the corporation, took out two policies with the Oregon Life Insurance Company, one for $10,000 and the other for $5,000 in favor of the corporation as beneficiary. The initial premium and the premiums for 1923 and 1924 were paid by the beneficiary corporation.

On March 1, 1925, the Jacobsen-Munro Company sold its business to the Bowles Company and in recognition of Lyman's faithful services to the company, on March 25th, the corporation relinquished its interest in the policies to Lyman, and, thereupon, Lyman named his estate as beneficiary. At that time the policies had aggregated a cash surrender value of $795 and a paid-up value of $1,365. That is to say, he could have surrendered the policies at the time of re-assignment to him in the sum of $795 in cash, and a paid-up policy of $1,365. The policies were re-assigned to Lyman on the seventh day of March, 1925, at which time Lyman expressed the opinion

that he would be unable to carry the policies, and two days thereafter, to wit, on the ninth day of March, 1925, he assigned them to Jacobsen, the assignments being in a typewritten form of the company and in letters and figures as follows:

"For one dollar, to me in hand paid, and for other valuable consideration (receipt of which is hereby acknowledged) I hereby assign, transfer and set over all my right, title and interest in (Policy No. 20108) on the life of De Witt Henry Lyman issued by Oregon Life Insurance Company, and all money which may be payable under the same, to Waldemar T. Jacobsen, and for the consideration above expressed I do also for my executors and administrators, guarantee the validity and sufficiency of the foregoing assignment to the above named assignee, his executors, administrators and assigns; and his title to the said policy will forever warrant and defend.

"In witness whereof I have hereunto set my hand and seal this 9th day of March, 1925.

"DEWITT HENRY LYMAN."

The insurance company assented to the assignment and Jacobsen paid the premiums. All together he paid either in cash or dividends, or by giving his note, the total sum of $1,533.95, the dividend amounting to $222.40, the total actual cash payments amounting to $169.40, and the payment by note amounting to $1142.10, which note was secured by the policies themselves.

Lyman died on the twenty-first day of July, 1926, aged 56 years and 7 months. The amount due on the policies and received by Jacobsen amounted to $13,-931.58. The plaintiff sued Jacobsen for the sum of $13,755.05, being the amount of the policies, less the premiums paid by Mr. Jacobsen, plus interest, but not deducting the $1,142.50 represented by his note.

At the time of the assignment Lyman was 55 years of age, and had an expectancy of 17.40 years. If he had lived to his expectancy, Jacobsen would have had to pay $14,624.70.

There is no question raised as to the validity of the policies, the principal question here being as to the validity of the assignment by Lyman to Jacobsen.

It is contended by the plaintiff, that the assignment of the policies was without consideration, to a person not related to the assured, and who had no interest in his life; that the assignment was therefore a wagering contract and void, and that Jacobsen is only entitled to recover the sum actually paid on account of premiums, namely, $169.45. This is the only question in the case.

The authorities are very much divided on the subject of what constitutes a wagering contract of insurance, but we are of the opinion that this case does not come within the definition of wagering or gambling contracts, and that the transfer was valid.

We will now cite some of the authorities, which, in our opinion, sustain that view of the case. In the case of *Chamberlain* v. *Butler*, 61 Neb. 730, 736 (86 N. W. 481, 482, 87 Am. St. Rep. 478, 481, 54 L. R. A. 338), the following circumstances appear:

"We are aware that there is a sharp conflict of authorities in the several American courts relative to the validity of a sale of a life insurance policy by one having an insurable interest to one not having such interest. In all the states, perhaps, it is held against public policy for one not having an insurable interest to procure insurance upon the life of another, even though it be with the consent of such person. In some of the states it is held against public policy for one who has taken out insurance upon his own life to transfer it to one having no insurable interest. In

some of the states such a transaction is prohibited by express legislative enactment. But the question to be decided is, assuming that Chamberlain had no such interest in the life of Butler, could he legally buy the policy in question, such policy in its inception having been valid and taken out in good faith by Butler, with no intention or design on his part of assigning it subsequently to Chamberlain? Those courts which hold such a transaction void proceed on the ground of public policy. Originally, at common law, choses in action that were assignable were exceedingly few; but the tendency is now reversed, and those not assignable are the exception rather than the rule. The modern policy being, then as above stated, the reason for a rule contrary to such tendency should be exceedingly strong before a court, where the question is yet unsettled, should adopt a contrary rule in any given case. While public policy is a salutary thing, it has its limitations and dangers. Among them is the fact that it is an exceedingly indefinite term, has no lines of distinct demarcation, and may readily lend its aid to a court anxious to make a good case, rather than a safe precedent. For that reason, before a case is decided upon that ground solely, courts should be very sure that the reasons for so doing are clear, strong, and admit of no doubt concerning their reasonableness or applicability. Now, the principal reason for branding assignments of this nature as inimical to sound public policy is that the interest of a stranger in the death of the insured is so strong as to tempt to murder the latter, the earlier to participate in the avails of the policy. Such interest doubtless tends to such a desire. But the same desire would exist on the part of a creditor who has an insurable interest, or of one who advanced money on the policy, where his only hope of reimbursing himself for the loan might be the policy. It is exceedingly doubtful if strangers are any more apt to either desire or seek to accomplish the death of others than are those nearly related to them. The strength of this desire, where it

exists, depends not so much upon the consanguinity of the parties as upon the moral stamina of him who holds the expectancy, be that expectancy an insurance policy, a devise, a remainder or other acquisition which may not be had until the death of another. Another reason sometimes assigned for holding such assignments illegal is that an assignee having no insurable interest is in the position of one who in the first instance takes out a wager policy. But we think not. If an insurable interest exists in the beneficiary at the time the policy is issued, and it is taken out in good faith, the object and purpose of the rule against wager policies would seem to have been sufficiently attained (16 Am. & Eng. Ency. of Law, 2 ed. 846); and there is no more reason to apply the rule to policies taken out in good faith and afterward assigned in good faith than there would be were the assured to retain it in his own hands.''

In *Grigsby* v. *Russell,* 222 U. S. 149 (56 L. Ed. 133, 32 Sup. Ct. Rep. 58, Ann. Cas. 1913B, 863, 36 L. R. A. (N. S.) 642), it was held that:

''The holder of a valid policy of insurance upon his own life may make a valid assignment of the policy to a person having no insurable interest in the life of the insured, in consideration of a sum of money and an undertaking to pay the premiums due and to become due, and the assignee takes the entire interest in the policy, as against the personal representatives of the insured.''

In *Harrison* v. *Northwestern etc. Ins. Co.,* 78 Vt. 473 (63 Atl. 321, 112 Am. St. Rep. 932), the following facts appear: Harrison insured his life for the benefit of his estate and immediately assigned it to Mary A. Gleason, who had no insurable interest in his life. Harrison paid the premiums for several years except the last premium which was to be paid by Mary A. Gleason. It is held substantially as follows:

"A policy procured by man on his own life, in which he has an insurable interest, for the benefit of one named therein who has not such interest and who makes no outlay in the matter, is not a wager, and such policy, though assigned without consideration to such person, is no wager."

The court among other things, said:

"The principle of these cases applies here, and necessitates a reversal, unless we can say, as the plaintiff claims, that the assignment is void for want of consideration. But we cannot say that, for if it was a gift, as it may have been, a consideration is not essential to its validity: *Watson* v. *Watson,* 69 Vt. 243 (39 Atl. 201)."

In *Keckley et al.* v. *Coshocton Glass Co.,* 86 Ohio St. 213 (99 N. E. 299, Ann. Cas. 1913D, 607), it is held that a life insurance policy is not a mere contract of indemnity, but a contract to pay a certain sum in the event of death, the court saying:

"One who has obtained a valid insurance upon his life may dispose of it as he sees fit, in the absence of prohibitory legislation or contract stipulations. It is immaterial in such case, that the assignee has no insurable interest. *Eckel* v. *Renner,* 41 Ohio St. 232, approved and followed."

In *McGlynn* v. *Curry et al.,* 82 App. Div. 431 (81 N. Y. Supp. 855), it was held that the fact that there was no consideration between the parties was a matter of no consequence. The policy had the characteristics of personal property, and it was clearly within the power of the owner of the property to make a valid gift of the same. The beneficiary had a right, if the insured failed to pay the premiums, to pay them herself and continue the policy in force.

In *McNevins* v. *Prudential Ins. Co. of America,* 57 Misc. Rep. 608 (108 N. Y. Supp. 745), Luke McNevin

took out a policy on his life and handed it to his wife saying: "Take this policy and pay on it." Which, she did up to the time of his death. There was no written assignment of the policy. The company defended upon the ground that plaintiff, having no written assignment, had no legal capacity to sue. The court held that the policy could be transferred the same as any other personal property, and that, as a gift, the transfer required no consideration, but upon the voluntary act of the insured only, and that it was accomplished by the delivery of the policy.

*Olmstead* v. *Keyes,* 85 N. Y. 593, 598, was a case involving the question as to whether a life insurance policy was a chose in action. With reference to this, the court said:

"Like every other contract to pay money such a policy is a chose in action with all the ordinary incidents of every other chose in action. It is abundantly settled in this state, that one who takes an insurance upon his own life may make the policy payable to any person whom he may name in the policy, and that such person need have no interest in the life insured, and that if the policy be valid in its inception, the party taking it may assign it to any person as he could assign any other chose in action, and that the policy will continue valid in the hands of the assignee, although he has no interest whatever in the life insured. So a creditor may take out a policy on the life of his debtor, and the policy will continue valid although the creditor has been paid and thus ceased to have an interest in the life of the insured. In *Ashley* v. *Ashley* (3 Simons, 149), A insured his life and afterward assigned the policy to B for a nominal consideration; B's executors then sold and assigned the policy to D for a nominal consideration, and then D's executors sold it to E; and it was held that they could make a good title to the policy, and that E was bound to complete his purchase. This case was cited and ap-

proved in 3 Kent's Com. 370, note, and has since been cited with approval in several reported cases in this state. In *St. John* v. *The American Mutual Life Ins. Co.* (2 Duer [9 N. Y. Super. Ct.] 419), DUER, J., a judge very learned in the law of insurance, writing the opinion, held that an assignment of an insurance policy to one having no interest in the life insured, was valid, and he said: 'The objection to the recovery in this case assumes, and such was the argument, that there can be no absolute sale of a subsisting policy and that its assignment is only valid when made as a collateral security for an antecedent debt; but, as we understand the law, a written promise to pay a sum of money is just as properly a subject of transfer, for value, where it depends upon a condition, as where it is absolute; and we can, therefore, make no distinction between the rights of a *bona fide* assignee of a policy and those of an assignee of a mortgage.' He then cited the case of *Ashley* v. *Ashley,* and further said: 'This case, therefore, proves not only that the absolute sale of a life policy does not affect the validity of the contract, but that the assignee for value, in the event of the death of the assured, is entitled to the same remedies as is his personal representative when the title to the policy is unchanged.' This case was affirmed in this court (13 N. Y. 31 [64 Am. Dec. 529]), and the doctrine was there again announced that a valid policy of insurance effected by a person upon his life is assignable, like an ordinary chose in action. CRIPPEN, J., writing the opinion of the court, said: 'I am not aware of any principle of law that distinguishes contracts of insurance upon lives from other ordinary contracts, or that takes them out of the operation of the same legal rules which are applied to and govern such contracts. Policies of insurance are choses in action, and are governed by the same principles applicable to other agreements involving pecuniary obligations.' And he further said: 'I do not agree with the counsel for the defendant, that the assignee must have an insurable interest in the life of the assured in order to entitle

him to recover the amount of the insurance. If the policies were valid in their inception, the assignment of them to the plaintiff did not change the liability of the company.' In *Valton* v. *National Fund Life Assurance Company* (20 N. Y. 32), it was held that one who has obtained a valid insurance upon his own life may dispose of it as he sees fit, and that it is immaterial that the assignee has no interest in the life. In *Rawls* v. *American Life Insurance Company, supra,* it was held that it is not necessary that a party holding a policy on the life of another should have an insurable interest in such life at the time of the death to make the policy valid, if it was valid in its inception. (See, also, *Clark* v. *Allen,* 11 R. I. 439 [23 Am. Rep. 496]; Law of Assignments of Life Policies, by Hine & Nichols, 73, 75, 81; Bliss on Life Ins. (2 ed.), §§ 23, 26, 30.)

"The rule, as gathered from these authorities, is that where one takes out a policy upon his own life as an honest and *bona fide* transaction, and the amount insured is made payable to a person having no interest in the life, or where such a policy is assigned to one having no interest in the life, the beneficiary in the one case and the assignee in the other may hold and enforce the policy if it was valid in its inception, and the policy was not procured or the assignment made as a contrivance to circumvent the law against betting, gaming and wagering policies. It follows, therefore, that one may, with the consent of the insurer, deal with a valid life policy as he could with any other chose in action, selling it, assigning it, disposing of it, and bequeathing it by will, and it has been well said that if he could not do this, life policies would be deprived of a large share of their utility and value."

*In re Phillips' Estate,* 238 Pa. St. 423 (86 Atl. 289, Ann. Cas. 1914C, 282, 45 L. R. A. (N. S.) 982), it is said:

"That a life insurance policy is assigned to a person having no insurable interest therein does not in-

validate the policy where it was valid at its inception.''

We agree with the doctrine of this case. Among other cases, plaintiff cites *Brett* v. *Warnick,* 44 Or. 511 (75 Pac. 1061, 102 Am. St. Rep. 639).

The sum of reasoning in this case is, that, if a person takes out an insurance on his life apparently for his own benefit, but in fact it is taken out for the benefit of another who has no insurable interest, the assignment being merely used to cover up the previous void transaction, the assignment being tainted with previous illegal intent, is also void. But, if the illegal intent did not exist in the inception of the insurance contract, and the assignment is *bona fide,* it is valid. Taking the opinion as a whole, it does not disagree in its conclusions with the authorities cited by defendant.

*Warnock* v. *Davis,* 104 U. S. 775 (26 L. Ed. 924), is a case which is evidently the key to the plaintiff's position, but as pointed out by Justice HOLMES in *Grigsby* v. *Russell, supra,* the agreement with the insured to take out the policy *preceded* the actual act of taking it out and the assignment was only in pursuance of that agreement, and, while Justice HOLMES concedes that, as applied to the facts in that case, the transaction came within the rule against wagering contracts, he refused to follow the intimation in the opinion, ''if there be any sound reason for holding a policy invalid when taken out by a party who has no interest in the life of the assured, it is difficult to see why that reason is not as cogent and operative against a party taking an assignment of a policy upon the life of a person in which he has no interest. The same ground which invalidates the one should invali-

date the other; so far at least, as to restrict the right of the assignee to the sums actually advanced by him,'' saying:

"On the other hand it has been decided that a valid policy is not avoided by the cessation of the insurable interest, even as against the insurer unless provided by the policy itself. *Connecticut Mut. L. Ins. Co.* v. *Schaefer,* 94 U. S. 457 (24 L. ed. 251). And expressions more or less in favor of the doctrine that we adopt are to be found also in *Aetna L. Ins. Co.* v. *France,* 94 U. S. 561 (24 L. ed., 287); *New York Mut. Life Ins. Co.* v. *Armstrong,* 117 U. S. 591 (29 L. ed. 997, 6 Sup. Ct. Rep. 877). It is enough to say that while the court below might hesitate to decide against the language in *Warnock* v. *Davis,* there has been no decision that precludes us from exercising our own judgment upon this much debated point. It is at least satisfactory to learn from the decision below that in Tennessee, where this assignment was made, although there has been much division of opinion, the supreme court of that state came to the conclusion that we adopt, in an unreported case, *Lewis* v. *Edwards,* December 14, 1903. The law in England and the preponderance of decisions in our state courts are on the same side."

So the views of Justice FIELD in *Warnock* v. *Davis, supra,* may be taken as expressly overruled by the case of *Grigsby* v. *Russell, supra.* The latter case is copiously annotated in the reproduction in Ann. Cas. 1913B, 863, and the weight of authority seems largely the favor of the position taken by defendant in the case at bar.

In the case at bar we have this state of facts: Decedent's knowledge and experience in the business in which the corporation was engaged were so valuable to the corporation that it had an insurable interest in the continuance of his life. At their request, he took

out the policies in question for the benefit of the corporation, the two principal officers and stockholders therein doing the same thing at the same time. The corporation having sold its physical property and not intending to conduct the business in which it was engaged, were advised by a representative of the insurance company that Mr. Lyman's services having ceased, they no longer had an insurable interest in his life. Whether this view of the case was erroneous or not, does not concern us so far as this case is concerned. The corporation assigned the policy to Lyman, who, a day or two afterwards, feeling himself unable to carry it, selected the defendant as his beneficiary. The corporation not being extinct, might have carried the policy in its own name, but one of the two stockholders objected, evidently not considering the payment of premiums justified under the circumstances, and they, therefore, turned the policy over to the deceased, and he a day or two afterward assigned it to the defendant who had been a long-time personal friend of his.

The assignment states as a consideration, the sum of one dollar and other considerations. What these other considerations are does not appear and, we think, taking the true intent of defendant's pleading, we are justified in saying that there was no other consideration, and that it amounted to a gift to his old-time friend and employer.

The policy was his personal property. He had a right to transfer it to whom he pleased, to sell it, or to give it away just as any other personal property in case the transfer was satisfactory to the insurer which it evidently was.

As shown by the authorities cited, it was a mere chose in action and he had the same right to dispose of it as he would have had he been given a horse, or an automobile, or any other personal property. Whether, under the circumstances, it was bad judgment for him to give it away is not a matter for us to consider. The fact remains that he did transfer it absolutely. He seems to have been a man of at least fair judgment, as the fact, that the corporation placed such reliance upon his judgment and usefulness as to insure his life for its benefit, indicates.

It is safe to say that he knew exactly what he was doing, and we cannot, in the present state of the record, say that any fraud was practiced upon him in procuring the assignment.

Blauvelt, the insurance man, who managed the affair to some extent, is dead. The defendant did not think it necessary to go upon the stand and we have no evidence, at least no admissible evidence, of any kind tending to show that the transaction was anything except what it purports to be. What Lyman's motive may have been is a matter of speculation. That it would have been better for him to have kept the policy so that his family would have the benefit of it may be possible in the light of subsequent events, and in view of the fact of his death 20 months after the transfer to the defendant, it is clear that it would have been better for his estate, if he had kept the policy; but he had more than 17 years expectancy of life at the time that he made the assignment, and the premiums on the policy would have amounted, irrespective of dividends, to probably $12,000, and the estimate is more than that.

Whether he felt under obligation to his employer for past employment, or had other reasons for making the transfer, we do not know. Death has sealed his lips, but, so far as appears from the testimony, it is probable that he was in good health at the time he made the transfer and shrunk from the prospect of paying out the large sum of money which would be required to keep it in force during the period of his life expectancy. But these matters are matters of speculation. The policy was his; it was his personal property. He had a right to give it to defendant, or sell it to him, or make any disposition that he saw fit, and we cannot say that any fraud or deceit was practiced upon him to induce him to make the transfer in the light of the authorities before cited. While the disposition that he made of the policy has worked some hardship on the estate, we cannot say that it was invalid, or that there is any legal reason why we could require defendant to repay the amount collected to the estate. Generosity might dictate to a man of delicate sensibilities that such a course would be proper, but we have no authority to compel parties to be generous.                              AFFIRMED.

The decree of the court below is affirmed.

COSHOW, C. J., and RAND and ROSSMAN, JJ., concur.